Good morning, everyone. Welcome. Our first case for argument this morning is Shemika Mitchell v. Durham Enterprises. I believe we have Mr. Keefe remotely. Is that correct? Yes, ma'am. All right. Can you hear me okay? Yes, Your Honor, I can. Can you all hear me? Yes, we can. You may proceed. Thank you. May it please the Court. And I thank the Court at the outset for the accommodation and allowing me to appear remotely. I'm very grateful for that. Your Honors, I, as a young lawyer, got to serve as a panel attorney, the CJA panel. And that allowed me to try a lot of cases, and it was a great experience, and I loved it. In trying those cases, I became very familiar with the Seventh Circuit jury instructions. And my favorite instruction was always the so-called ostrich instruction. And the ostrich instruction is the second part of the definition of knowingly. And it provides that you cannot deliberately avoid learning the truth. You cannot be willfully ignorant or stated otherwise. You cannot stick your head in the sand. And I would respectfully submit that the bottom of page 11 of Liberty's brief is a textbook example of an insurance company sticking their head in the sand. Page 11 is where they explain how it is that their supervisor, a man by the name of Mr. Hilgerman, came to his decision that the consumption exception did not apply in this case. And what Liberty says is that Mr. Hilgerman relied on the unambiguous allegation that Durham Enterprises failed to properly clean the, quote, dialysis center, and concluded that a, quote, dialysis center would not reasonably be interpreted to be a good or a product intended for bodily consumption. Can I ask you, though, Mr. Keith, let me, I apologize for interrupting, but my concern when we focus on the consumption exception is how clearly, or not, I mean, what did the original operative complaint say the good or product that was intended for bodily consumption was? Obviously not the whole center. You know, if people don't consume an entire center, it seems to me that would be a very strained reading of that term. But is there ever an allegation, I looked and I didn't see one, but maybe you're more familiar with the record, to focus on what exactly was the good or product intended for bodily consumption? Your Honor, the good or product intended for bodily consumption is dialysis. And what I believe that the duty of the insurance company would be under Missouri law, and Your Honor is correct about the complaint, the complaint does not specify that dialysis is the good or product, but that's not the question and that's not the issue. But dialysis even sounds like pretty general. I mean, you never allege, for example, that the catheters that are used in conjunction with dialysis or tubes or exposure to the machine, it's an elaborate process, but of course it does involve hooking a person up to other foreign things, you know, machines and stuff so that the blood can be clean. But how specific does the complaint have to be? Would it be enough for a complaint just to say that Mr. Harris was exposed to bacteria and they entered his body? Or, you know, how do we distinguish between what falls within the general rule of excluding bacterial exposure and what falls within the exclusion? I don't believe that that distinction is what the appropriate inquiry would be under Missouri law. I believe that the question is whether or not a reasonable investigation on the part of the insurance company should have yielded a conclusion that there was a possibility of coverage in this case. When we plead the complaint, we don't know what exactly the insurance policy is. We don't know what exactly the exception or the exclusion is. And that's not what it is that the issue is in this case. And that's not what the issue was before the district court. The issue and the question is what it is that a reasonable investigation on the part of the insurance company in this case should have yielded. And your honor is absolutely correct that dialysis would be broad. Your honor is absolutely correct that there are several components of dialysis that may or may not directly implicate the notion of consumption. But that is not the question that would appropriately be before the insurance company in this case. The question before them is precisely what your honor asks, which is what is dialysis? And the conclusion is precisely what your honor identified, which is that dialysis is a process whereby you are hooked up to a machine and your blood is filtered through that machine and toxins are filtered out of your blood. There are several components including, again, filters to that machine. All of those components are contained within the office where it is that Durham was contracted to clean where it is that they are alleged to have negligently cleaned. What are the limits in your judgment on the reasonable investigation obligation that you're proposing? Because it sounds to me, and the reason I ask the question is because of the content of what was in those medical certificates that were attached to the complaint. Is the duty to investigate or conduct a reasonable investigation require running to ground the precise cause or source of Mr. Harris's sepsis? No, sir. It did not. And again, this is the way it is that Liberty frames it. I believe that the way that Liberty frames that question is it's a head fake and it's basically a red herring. The duty to investigate requires at a minimum some degree of investigation. The depositions of Liberty's own people in this case demonstrate that they didn't perform any type of an investigation at all. What we believe a reasonable investigation would be, Your Honor, to answer your precise question, would be a two-pronged inquiry. Number one, you ask yourself, what is dialysis? If you look at what Liberty says here, Liberty is suggesting that the inquiry is whether or not a, quote, dialysis center constitutes a good or product for consumption. That's not the question. The focus is on the word dialysis. The focus is on not on the word center. The focus should be on the word dialysis. Question number one, what is dialysis? If you know the answer to that question, then you would know that it involves a process whereby blood is filtered in and out of the body, consumed by the body. And if you don't know that answer, then step number two is one of two things is a reasonable investigation. Either number one, you make an inquiry of any of the many doctors who are on staff at Liberty and the record reflects that they have many doctors they could have talked to. Or number two, you do a simple Google search. And you will find that either of those two things would yield the conclusion that Judge Wood articulated very simply at the outside of this argument, which is that is what the process of dialysis is. And if that's what the process is, if you are filtering blood and the body is reconsuming that blood, and that is a process that takes three to five hours while you were within that facility. Certainly, there is a possibility that you can consume bacteria. You either consume it via the machines, you consume it via a drinking fountain, or if they bring you a beverage or something to eat. But that is what a reasonable inquiry would be. So can I ask why the things you're saying, well, let me put it this way. What's the role of speculation or imagination in all of this? I mean, I can imagine, you know, he walks into the dialysis center and there's an apple sitting on the counter and he decides to eat it because it's in a bowl inviting people to do that. And he consumes something that, unbeknownst to him, has bacteria on it. So, you know, this is in the realm of imagination. And I just want to know where you think that line lies. How much does he have to allege specifically, even in a state court complaint? And how much do we just let our imaginations take over? Well, Your Honor, I think it depends very much on the facts of the case. And I think that when the inquiry that you're raising is an inquiry that actually looks to the distinction between the duty to defend and the duty to indemnify. I think those answers may well have come later on in the process. And if the case proceeded further, perhaps the determination gets made that, yes, we can conceive or there's a possibility. However, under the duty to indemnify, we're just not there. That may well happen in this case. But we don't get a chance to find that out in this case, Judge. There's a question of fact that should get us to that point if Missouri law is appropriately followed in terms of what the procedure should be. And that is that the insurance company asks whether there is any possibility, because that's the inquiry at this stage. Is there any possibility of a coverage, of coverage? And if there is, in fact, that possibility, that triggers the duty to defend. And what's the duty to defend? It's really too late for all of this. Much of what I'm hearing and seeing in your approach to this case on appeal was not really litigated in the earlier stages of this case. And your argument has expanded and shifted on appeal. And so I don't know if we have your argument even properly before us. But to the point about the reasonableness of the insurer's investigation, after the initial denial of coverage, you were invited to submit further information that would flesh out your claim for coverage and did nothing to do that. So if this argument about the bodily consumption exception to the bacterial exclusion were in play, that would have been the time to bring it to the insurance company's attention. You did not. The insurers were not brought into the state court case until after judgment. So the whole issue of coverage was not litigated in an adversarial way in the state court action. The case moves into federal court after you brought the insurers in after you won the judgment against the insurers, who were not parties to the case, which was highly unorthodox to begin with. But setting that aside, the insurers are now in the case. They remove the case to federal court. You didn't join issue with the bodily consumption exception in any significant way in the district court in the way that you are. Let's put it this way. In the way that you're engaging with the bodily consumption exception now, you did not engage with it in that same way in the district court. And it is your burden under conventional principles of insurance law that are followed in Missouri and every other state. If you're seeking enforcement of an exception or if you're trying to bring yourself within the exception to an exclusion, it's your burden. It's not the insurance company's burden. And you didn't do that here. Do you have a response to that? I do, Your Honor. And I appreciate the question. And I don't believe that Your Honor's outline of that history is inaccurate. Let me ask you this. Did you identify the bodily consumption exception to the exclusion as the basis for your claim of coverage in any of your pleadings in federal court? I believe that absolutely it was identified as a basis for coverage at the summary judgment stage. Was it identified as the basis for your claim for coverage in any of the earlier pleadings in the case? Answers to interrogatories, your answer to the cross-claim, any other pleadings? Or was it just introduced into the case on the summary judgment motions? Well, I think it was introduced into the case earlier than that. And it was a clear basis for the case. Was it overtly stated? When was it introduced? Was it introduced for the first time at summary judgment? It's introduced by virtue of the pleading of a declaratory judgment and the argument for a declaratory judgment by implications. The insurance company has the burden to prove what the exclusion. It's your burden to prove that an exception to an exclusion applies. Under the Transworld Airlines case, Your Honor, that's correct. And I agree with that. However, prior to that, it is the insurance company's burden to demonstrate the applicability of an exclusion following a reasonable investigation. As to what it is that Your Honor is articulating on our front, I think we could have done a better job. I could not agree more with Your Honor about that. It is unorthodox. I could not agree more about that. However, before we get to that point, there should have been a reasonable investigation. And with respect to many of the things that we perhaps could have done a better job on, Liberty had already opted out of the case. And they had already denied coverage. And the suggestion that they then flip the burden to the insured to prove why it is that they should in fact do what it is that they were contracted to do, that, Your Honor, respectfully, I believe, conflates what the process and the order is supposed to be under Missouri law. And so that's why I would respectfully disagree with the court. Before you conclude, I have a question about the Rooker-Feldman argument. Are you abandoning that argument? Yes, ma'am. You are abandoning your Rooker-Feldman argument? No, ma'am. I don't think that we're abandoning our Rooker-Feldman argument. I believe that our Rooker-Feldman argument, as stated in our brief, is appropriate. And I believe there is a basis to argue in good faith for an extension of Rooker-Feldman as it currently exists. An extension to non-parties? Well, in this case, Your Honor, this would be a – they became a party afterwards, as Chief Judge Sykes has outlined the procedural history accurately. However, they only became a party afterwards because they, despite having notice of this, opted out of the case in the first instance. The insurance company did not defend under a reservation of rights. They did not file any type of a DJ. Mr. Keefe, how is your – we know the – or I think we understand what happened, as a matter of fact. How is your position on Rooker-Feldman not foreclosed by the reasoning of the U.S. Supreme Court's decision in Lance? Judge, footnote two. Footnote two in the Lance decision gives an opening. Footnote two specifically says we do not foreclose the possibility of an extension of the Rooker-Feldman doctrine for non-parties in limited circumstances. They don't articulate what specifically all of those circumstances would be. And we believe in this case, given the history and the insurance company's refusal to opt in, despite having a clear opportunity to do so, that this could be a – now, the court may disagree with that, and the court may not be particularly open or inclined to do so. You all made a choice, as Judge Sykes is saying. You made a choice not to bring the insurance company into the state court litigation, and that may be where you pay for it under Rooker-Feldman law. Anyway. You did not file a response to the Rule 38 motion for sanctions for the arguably frivolous Rooker-Feldman argument? That's correct, Your Honor. We did not do so. There was a notice from the court that said it would be taken together at argument. We believe we have a good faith basis for doing so. The court may disagree, but it's subject matter jurisdiction, and the district court never responded negatively in response to what it is that we stated. And so I thought that I would address it here and that there was an invitation to do so. But you're correct, Your Honor, that we did not file a specific response to that previously. All right. Thank you. Mr. Frappoli, my understanding is you're not taking the opportunity to argue. Is that right? That's correct, Your Honor. All right. Thank you. Mr. Wolff. Good morning. My name is Matt Wolff, and I represent Ohio Security Company, a liberty mutual insurance company in this appeal. The argument that appellant's counsel made is a brand-new argument as of today. It was waived in multiple ways. First, it was waived in the district court because it wasn't raising the pleadings. We specifically sent a request for admission asking, what is the basis for your position that the insurers had a duty to defend? It was not raised in the response to that. Excuse me, it was an interrogatory, not a request for admission. Then, in this appeal, we argued waiver in the response brief. They didn't file a reply. That, in itself, is also waiver under this court's precedent. They have no response to this. The third way it's waiver is this argument that Mr. Keefe made today is a brand-new argument even in the context of the consumption exception. It's not in their briefs. This concept that dialysis is the good or product has never been raised before. Mr. Wolff, can I ask you, my inclination on the case was to start where Judge Wood started, and that was with the underlying complaint in state court. To my mind, when I look at that underlying complaint, the heart of the allegation seems to be that Durham, the company, failed to clean the facility, do things like, I'm looking right at the complaint, like mop the floor, change out the mop heads, failure to clean touchable surfaces, et cetera. I don't even read the complaint to be talking about cleaning, in any way, the actual equipment that's used for the dialysis procedure. The reason I'm asking you that question is, if that's the case, do we even need to reach the particular consumption-based argument, notwithstanding these waiver points that are being made? Because the argument seems to be that, with respect to the equipment or the supplies used in dialysis, you could reasonably construe the allegations to be, that's how the bacteria was transmitted that led to the sepsis, the infections, that way. But I don't read the complaint that way. I read the complaint like you failed to mop the floor, you weren't changing the mop heads, you weren't using the right solutions, et cetera. That's right. The complaint draws an important distinction between the two sets of defendants. But what about Part 8, negligently and carelessly failed to properly maintain dialysis machines and equipment to minimize the risk of infection to patients? Given the broad standards, I mean, we're not here to tell Illinois how detailed or not complaints should be in their courts. So when the insurance company reads that, is that enough to get us to the machine? No, because that's only directed at Reno LifeLink and DaVita, not at Durham, which in the complaint is referred to as citywide, which was a trade-off. So counts 1 and 2 are directed at Reno and DaVita. They're the companies responsible for running the dialysis facility, giving patients the treatment. Count 3 as to citywide, which is Durham, one of the appellants here, only incorporates paragraphs 1 through 4 of counts 1 and 2 and then has a separate paragraph, count 5. In there, the only allegation against Durham is failed to properly clean and sanitize the dialysis center. Broad, global, failed to properly clean and sanitize the dialysis center. So then, as I understand your opponent, he's saying you should read that and then dig down and say somehow that that could include everything if you actually made enough of an investigation. I don't think that's a reasonable inference that you can draw from the way the complaint is actually plotted. The complaint separates the defendants out, only pleads that count against Durham and that allegation against Durham, and you have to read it in context of the statement that Durham provided commercial cleaning services and failed to clean and sanitize the dialysis center. As the other defendants, there are much more specific allegations that go to the machines and equipment. There's no reason to think, based on the complaint or common sense, that Durham, the commercial cleaning services, as the district court pointed out, effectively a janitorial company, would be responsible in any way for these machines and equipment, especially when they're pledged specifically in relation to DaVita and Menal Life Link. Mr. Keefe raised the idea that some further investigation should have been done. That's not an accurate conception of how the duty to defend is determined under Missouri law. Under Missouri law, the insurer is to look at the complaint, other materials that come in with the complaint, and the language of the policy and compare them and make a determination. The determination is supposed to be prompt. The insurer is not allowed to wait around and search for deposition transcripts and wait for developments in the underlying case. The train wreck case cited in our briefs is a good example of that. There, the insurer received an underlying complaint together with some police reports, read them together, determined an exclusion applied. The insured argued later, well, the insurer should have waited around until depositions were taken. They should have conducted more facts. That might have shown the exclusion didn't apply. The Missouri Court of Appeals said, no, that's not how you do it. The insurer has to read the complaint and the other materials, read the policy, make a determination. The determination was proper here based on what the complaint actually pleads. Moreover, the appellants have never pointed to any fact that would actually show that there was a good or product intended for bodily consumption that relates to Durham in any other way. As I said, this idea that dialysis was the good or product is a brand new argument. And Durham was the commercial cleaning services company. That's what the complaint said. They were the janitor. There would be no reason to think on any reasonable reading of the complaint at the outset, or today for that matter, that the consumption exception could ever potentially apply. So the insurance company correctly decided that there is no duty to defend. I'd like to address the Rooker-Feldman argument briefly unless there are further questions about the policy language. The Rooker-Feldman argument is completely foreclosed by Lance v. Dennis. The insurers were never a party to the state court case until they were served with the so-called First Amendment complaint after the consent judgment was entered. There's no basis in law or fact to argue that the Rooker-Feldman doctrine applied. And moreover, the failure to engage with our Rule 38 motion in the response in our appellate brief is another reason that sanctions and fees should be awarded for having to respond to the Rooker-Feldman argument. The consent judgment was drafted by the plaintiff's counsel and Durham's counsel and submitted to the court. It wasn't independently drafted by the state court. I take it that's usually how consent judgments work. That's our understanding based on the record below, yes. So there weren't any findings that were actually made by the district court in the sense of the court actually examining an evidentiary record and resolving disputes of fact. It was just a document prepared by the lawyers who were working together to get the consent judgment before the court with findings that would potentially trigger insurance coverage. Correct, and nor could the St. Clair County Court have made an independent judgment because, for example, the insurance policy wasn't submitted to it. I wonder, all of that being said, under the Supreme Court's decision in Martin against the EB company, where the court looks at something that was drafted by the lawyers and says, yeah, but it's still, you know, the judge signed it, so it's the judge's work. Is this something that is significant? In other words, does it drive the outcome one way or the other if the lawyers drafted it versus the court? Your Honor, I don't think the fact that the lawyers drafted it drives the outcome. The important point is that the insurance companies were not present in the case. They were not parties to the case. Didn't have their day in court, yeah. Yeah. There's no basis to bind them, or the district court rejected the collateral stop argument that appellants did not raise on appeal. And as soon as they enter, well, with a little bit of correction afterwards, there's the removal, right? Yes. Once we were served, we removed within 30 days, and that was all proper. Right. And my question was directed to the portion of the consent judgment that contained so-called findings regarding coverage, and instead of the underlying negligence claim against the cleaning company without the presence of the insurers in the litigation. And that strikes me as an unorthodox thing for a state court to do, to enter findings and conclusions about insurance coverage in a consent judgment between the parties to the underlying case without the insurers in the case. Yes, I would certainly agree with that. I mean, if I were sitting in state court, that would set off some alarm bells for me. I did sit in state court and looked at documents like this lots of times, and that would set off some alarm bells that I'm entering findings and conclusions about a party who's not present in the case. Sure. Without some further explanation from counsel. Sure. I'm not in a position to say what went through the St. Clair County judge's mind, but obviously once we were served, we removed, and we ended up in the district court. Right. This is all just to point out the unorthodox manner in which this litigation proceeded in state court. Yes, very much so. If there are no other questions, I'll conclude. Thank you. Mr. Keefe. We ask that you affirm and award sanctions and fees pursuant to the Rule 38 motion. Thank you. Thank you. Mr. Keefe, your time had expired. You may have a minute to wrap up if you have anything in response to state. Thank you, Your Honor, very much. A couple of things very quickly. Number one, it is unorthodox. However, Section 537.065 of the Missouri statutes endorses precisely the procedure that was followed in Illinois. It's not an Illinois process. It's a Missouri process. At that point, it was clear that Missouri law applied to this insurance policy, which is why we're obviously talking about it here. That's the basis for what I certainly agree with, Your Honor. To me, an Illinois lawyer seems to be an unorthodox one. Number two, specifically, counsel talked about a far-reaching investigation, and it needs to be a quick determination. I don't disagree that it needs to be a quick determination. But, again, two questions, very simply. What is dialysis? If you don't know that, ask a doctor or Google it. And those two things reasonably should trigger a possibility of coverage. That's all we're talking about. Is there a possibility of coverage? There was one here. That's why there was a question of fact. That's why we respectfully request that the case be reversed. Thank you all very much. All right. Thank you all very much. Thanks to all counsel. The case is taken under advisement.